# Duncan *v.* Williams.

*Bill in Equity to set aside Decrees, Conveyances, etc., on ground of Fraud.*

1. *Equitable relief against fraud; filing bill within twelve months after discovery.*—When a bill seeks equitable relief against a decree in chancery on the ground of fraud, after the statutory bar has been perfected in favor of the parties holding under it, it must allege with precision the facts which constitute the alleged fraud, and the discovery of those facts within twelve months before the filing of the bill (Code, § 2630); and it is not sufficient to allege the discovery of a *fact* tending, in connection with other facts already known, to show fraud.

2. *Presumptions from lapse of time, in favor of decree.*—When the validity of a chancery decree is assailed after the lapse of twenty years, on account of errors and irregularities patent on its face, the court will presume "almost any fact" necessary to sustain it, whether consistent with the record or contradictory of it.

3. *Adverse possession.*—Exclusiveness is an essential element of adverse possession, and it can not be asserted against the holder of the legal title by a person who is in possession jointly with him.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. THOS. W. COLEMAN.

The bill in this case was filed on the 6th July, 1888, by Mrs. Martharina Duncan and her husband, against the widow and children, personal representative and heirs of Price Williams, deceased, Albert E. Mudge, and several other persons; and sought to establish and enforce complainant's rights, as sole surviving child and heir at law of her deceased father, John J. Springsteel, in and to a house and lot in the city of Mobile, and an account of the rents and profits; and to this end it sought to impeach and set aside, on the ground of fraud, two decrees of foreclosure rendered by the Chancery court of Mobile, under which the property had been sold. One of these decrees was rendered in 1841, foreclosing a mortgage which said Springsteel had executed to Charles H. Earle, who was his wife's brother; and the other, also rendered in 1841, was under a bill filed by the Planters & Merchants' Bank and Jonathan Hunt, for the foreclosure of a mortgage on the property executed to them by one James F. Roberts, whose title or interest is not involved in the suit.

According to the allegations of the bill, the lot was sold and conveyed to Springsteel by Leonard Fash and wife, "on the 14th August, 1839, by deed not recorded;" but it was

further alleged that he had possession, claiming title, " long prior to 27th December, 1837," the date of the mortgage by Roberts to the bank. Springsteel built a dwelling-house on the lot, and continued in possession until his death, which occurred on the 15th February, 1840. After his death, his widow and two children continued in possession, the widow's dower not having been assigned; and one of the children died several years afterwards, during its minority. On the 20th April, 1842, the widow married Albert Mudge, and she afterwards had two children by him, who were made defendants to the bill. It was alleged that the mortgage to Earle, which was given to secure the payment of money borrowed, was in fact paid in full by the widow, a few weeks after her husband's death, with money belonging to his estate; but satisfaction was not entered of record, and the fact of payment was concealed. A few months afterwards, Mudge procured from Earle a power of attorney authorizing him to foreclose the mortgage, and the foreclosure suit was commenced and prosecuted under this power of attorney, by collusion between the widow and Mudge, although they knew the mortgage had been paid and satisfied. The widow made no defense to the suit, and a formal answer was filed for the infants by said Mudge as their guardian *ad litem*. Fash was also made a defendant to the suit, because there was on record a deed to him from said Springsteel, which appeared to be absolute on its face, but was in fact intended only as a mortgage; and he made no defense, "because he had been repaid, and had re-conveyed to said Springsteel, and had no interest to protect; and because he honestly supposed that the widow, complainant's mother, was doing what was right." Mudge became the purchaser at the sale under the decree of foreclosure, and the sale was confirmed. The bill assailed the validity of these proceedings, on the ground of fraudulent collusion between the widow and Mudge, who were then contemplating marriage, to defeat and destroy the rights of complainant and her infant brother, who was then living; and also on account of errors and irregularities patent on their face: (1) because the suit was commenced within twelve months after the death of Springsteel; (2) because his administrator was not made a party; (3) because process was not properly served on the infant defendants, &c.

As to the other foreclosure suit, under the bill filed by P. & M. Bank and Hunt, for the foreclosure of the mortgage executed by Roberts, it was alleged that the proceed-

[Duncan v. Williams.]

ings were conducted under some arrangement between said
Hunt and Mudge, by which the latter was to acquire what-
ever interest might be sold under the decree; that Hunt
became the purchaser at the sale under the decree, and soon
afterwards conveyed by quit-claim to Mudge, for a nominal
sum; that Springsteel's title had no connection with that of
Roberts, but antedated and was superior to it; that this fact
was discovered by the plaintiffs in that suit during its pen-
dency, and they therefore dismissed an amended bill which
had been filed for the purpose of bringing in Mrs. Spring-
steel and her children as parties, and they never were made
parties.

The bill alleged, also, that two children were born to Mrs.
Springsteel after her marriage with Mudge, both of whom
were made defendants to the bill; that Mudge died in 1848,
having executed his last will and testament, which was duly
admitted to probate, and by which he devised the property
to his widow for life, with remainder to their two children
and complainant in equal shares; that the widow lived until
March, 1881, and continued in possession of the property
up to the time of her death, but was insane for several years;
that she told complainant, "repeatedly and continually, that
she expected and desired her to-give said Albert E. and
Charlotte A., her half-brother and half-sister, an equal share
in the property, but always spoke of it as a matter depend-
ent on complainant's own volition; that neither said Mudge
nor complainant's mother, his wife, ever claimed openly, or
to her knowledge, that said property belonged to said Mudge,
and she never had any notice that she was ousted by said
Mudge or her mother, but always supposed that the land
was her father's, and that her mother was there permissively
as dowress and head of the family; and complainant says
that her mother kept her father's title-deeds concealed and
locked up, and never spoke of them, except to reiterate fre-
quently that the titles were perfect."

The bill alleged, also, that complainant remained on the
premises until her mother's death, in spite of opposition from
Albert E. Mudge, though she was forced to occupy a kitchen
or outhouse on the premises; "that immediately after her
mother's death, Albert E. Mudge forcibly, violently and
wrongfully took possession of all her mother's and father's
papers, and kept them from her, and took possession of all
the money and personal property, and employed said Price
Williams, a shrewd real-estate agent of large experience and

familiarity with property and titles in Mobile, to force her out of possession, and togther they drove her out by threats and notices to quit, representing that she had no interest in the property except under the will of Albert Mudge, and that the rents must be applied to the payment of debts." It was alleged, also, that complainant then employed an attorney to investigate and establish her title to the property, but, as no recorded deeds could be found, no litigation was begun; that in May and August, 1883, Albert E. Mudge and his sister sold and conveyed their respective interests in the property to said Williams, for the price of $250 and $275 respectively, and in July, 1883, complainant was induced by his threats and representations to sell and convey her interest to him, at the price of $350; that the property was at that time worth $2,000, or more, and said Williams was familiar with the true state of the title, though complainant had not then discovered the facts.

As to the discovery of the facts on which the complainant based her claim to relief, the bill alleged that, on June 12th, 1888, an attorney called on her in the interest of Mrs. Williams, who, as executrix and trustee under the will of Price Williams, was negotiating a sale of a portion of the property, "and asked for her father's title-deeds to said land, saying that he must have had a deed, but he could not find it recorded; that she replied, that she always thought so too, but never could find the deeds, and would have gone to law for the property if she could have found them; that this re-aroused her determination to find the deeds, and convinced her that they must have once existed, and she told the attorney that she would look further among papers for them;" that she remembered an old trunk, which had belonged to Albert E. Mudge, and which he, on leaving the State, had delivered to his sister, who, on her subsequent removal from the State, had placed it for safe-keeping in the possession of the complainant; that Mudge had frequently written, asking her to send the trunk to him, and she had not sent it because she supposed it contained "only old rubbish," and was not willing to pay the express charges; that the trunk was very heavy, and double-locked, but she succeeded in breaking it open, and found a package of papers inclosed in an envelope, which contained a receipt by Earle acknowledging payment of the mortgage debt, dated about two months before the bill for foreclosure was filed in his name, a conveyance from said Fash to Springsteel for the property, and other papers

in relation to it, and a memorandum in her mother's hand-writing, which stated their importance and the necessity of preserving them; and that an indorsement on one of the papers spoke of another deed as inclosed, which was not found.

On these allegations, the bill prayed, (1) that complainant's right and title to the property, as sole heir of her father, be declared, established and enforced; (2) that the decrees of foreclosure, the sales made under them, and the decrees confirming them, be set aside and annulled; (3) that the deeds to Price Williams, and the conveyances to other parties claiming under him with notice, be also set aside and cancelled; (4) that an account of rents and profits be taken, and (5) for other and further relief under the general prayer. The chancellor dismissed the bill on demurrer, for want of equity, and his decree is now assigned as error.

OVERALL & BESTOR, for appellant, cited the following cases: (1.) As to equitable relief against fraud—*Eslava v. Eslava*, 50 Ala. 32; *Lehman v. Shackelford*, 50 Ala. 437; *Humphreys v. Burleson*, 72 Ala. 1; *Shipman v. Furniss*, 69 Ala. 555; *Lee v. Lee*, 55 Ala. 590. (2.) As to adverse possession, and title thereby acquired under the statute of limitations—*Molton v. Henderson*, 62 Ala. 432; *Matthews v. McDade*, 72 Ala. 377; *Hall v. Law*, 102 U. S. 466; *McArthur v. Carrie*, 32 Ala. 75; *Garrett v. Garrett*, 69 Ala. 430. (3.) As to presumptions arising from lapse of time, *McArthur v. Carrie*, 32 Ala. 75; *Matthews v. McDade*, 72 Ala. 388. (4.) As to notice implied from long continued possession under deed.—*King v. Paulk*, 85 Ala. 186; *Paulk v. King*, 86 Ala. 332; *Fitzgerald v. Williamson*, 85 Ala. 585.

FIELDING VAUGHN, and PILLANS, TORREY & HANAW, *contra.* (1.) The demand or claim asserted by the bill is stale, and is barred by the statute of limitations of twenty years. *Scruggs v. Decatur Mineral & Land Co.*, 86 Ala. 178; *Badger v. Badger*, 2 Wall. 87; *Bowman v. Wathen*, 1 How. 189; 32 Ala. 75, 88, 98; 69 Ala. 430; 72 Ala. 388. (2.) The receipt was open to explanation, or contradiction; and its discovery, under the circumstances stated, does not bring the case within the statutory exception as to cases of fraud. *Robinson v. Walker*, 81 Ala. 404; *McDonald v. Life Insurance Co.*, 65 Ala. 358; *Tankersly v. Pettis*, 71 Ala. 179; *Gordon's Adm'r v. Ross*, 63 Ala. 363; Wait's Actions &

Defenses, vol. 7, p. 448. (3.) The errors and irregularities pointed out in the judicial proceedings, can avail nothing on collateral attack.—*Gordon's Adm'r v. Ross*, 63 Ala. 363; *Randle v. Boyd*, 73 Ala. 286; *McCall v. McCurdy*, 69 Ala. 73; *Preston v. Dunn*, 25 Ala. 507; *Bondurant v. Sibley*, 37 Ala. 571.

McCLELLAN, J.—There are apparently two decrees of the Chancery Court, which stand in the way of the relief sought by the present bill. Each of these decrees was rendered in the year 1841; each of them purported to foreclose a mortgage on the lands in controversy; each ordered a sale; under each a sale was had and confirmed, and a deed executed; and whatever title passed under either of them, is now held by the defendants below, appellees here. The bill in this case, which was filed July 6th, 1888, more than forty-six years after the enrollment of said decrees and the sales under them, can, of course, be maintained at this late day only upon the grounds of fraud in the procurement and rendition of the decrees, and that the facts constituting the fraud have been discovered within one year next before the institution of the suit.—Code, § 2630. It may be admitted, for all the purposes of this appeal, that the bill sufficiently charges fraud, and knowledge of it on the part of the respondents, to have entitled the complainant to the relief prayed, had the cause of action not passed under the ban of the statute of limitations; and proceeding upon the case presented with that concession, the pivotal inquiry is, whether the cause of action is brought by appropriate allegation within the exception to the statute above referred to, which, notwithstanding the bar has been perfected, considered apart from the concealment of fraud, allows one year after the discovery of the fraud in which suit may be brought. Does the bill charge, with the precision and directness which the law requires, that the facts relied on as constituting the fraud were discovered only within one year prior to July 6, 1888?

The bill is a very voluminous paper. It alleges transactions which are spread over nearly half a century. It charges the connection with these transactions, at various points along the line of their development, of a great number of people, many of whom are long since dead. It involves all of these people in the fraudulent purposes and practices, the first tangible result of which was the rendition

of the decrees in question in 1841, and the last development of which was the effort in 1887 to continue the concealment of the fraud from the complainant. All along throughout these years, covinous intent, resulting in fraudulent acts, is laid against complainant's mother, her step-father, her half brother and sister, disconnected third persons with apparently no interests to subserve in defrauding complainant, and against the persons who now claim the property. Yet, when the effort is made by the pleader to bring her case within the saving exception to the statute—when it was upon her to aver with precision that the facts constituting the fraud had been discovered within the year—the requirement is attempted to be met by the averment of one single fact, and this a fact which, at most, only tended to show fraud, from amongst the manifold substantive charges made by the bill.

To state the case more concretely: The bill alleges that John J. Springsteel, the father of the complainant, owned the land in controversy as far back as 1838 or 1839, and up to his death, which occurred in February, 1840; that at the time of his death one Earle held a mortgage on the land, to secure the payment of $1,000; that on April 25, 1840, complainant's mother, the widow of Springsteel, paid off this mortgage with money belonging to the estate, and took a paper from Earle evidencing the fact of payment and satisfaction; that soon after Springsteel's death, one Mudge and Mrs. Springsteel agreed to intermarry, and thereupon they entered into a conspiracy to defraud the complainant, then an infant of tender years, of her patrimony; and in execution of their fraudulent design, said Mudge, with knowledge of the fact that the Earle mortgage had been satisfied, procured from Earle, who was a brother of Mrs. Springsteel, a power of attorney to prosecute a bill to foreclose the satisfied mortgage; that this bill was filed in October, 1840, and prosecuted to decree against Mrs. Springsteel and complainant and her brother; that Mudge, while acting for Earle under the power of attorney in prosecuting the suit, was appointed by the court as guardian *ad litem* for the infant defendants; that at the foreclosure sale Mudge became the purchaser, and soon after married Mrs. Springsteel, and lived with her on the land up to his death, which occurred five or six years afterwards; that said foreclosure suit proceeded "almost side by side with another bill filed by the Planters & Merchants' Bank and Hunt" to foreclose a mort-

[Duncan v. Williams.]

gage on the land, executed in 1835; that said Mudge had arranged with complainants in this latter suit to acquire any title they should get out of that proceeding; that a decree of foreclosure passed in that case, the land was sold under said decree and bought by Hunt, who subsequently conveyed by quit-claim to Mudge; that Mudge paid nothing, or a nominal sum, for this conveyance, and that whatever he did pay was of funds belonging to the Springsteel estate; that this sale and conveyance passed no title as against complainant, because neither she, nor any one else in possession of the land, was made a party to the proceeding; that Mudge devised the land to complainant's mother for life, with remainder over to her children by Springsteel, of whom only complainant was living, and by himself, of whom there were two; that Mudge and his wife fraudulently concealed from complainant the evidence of the satisfaction of the Earle mortgage, and of a re-conveyance of the land to Springsteel by one Fash, to whom it had been conveyed in 1839, by deed absolute in form, to secure the payment of $1,000, and which original conveyance still stood upon the records; that after Mudge's death, this fraudulent concealment was continued by his widow, complainant's mother, and after her death, in 1881, it was in like manner continued by the son and daughter of Mudge—half brother and sister to complainant—until in June, 1888, when complainant broke open a heavy and heavily locked express trunk belonging to her half brother, and then for the first time discovered, and came to a knowledge of these long concealed papers, and to a knowledge of the facts constituting the frauds by which the two foreclosure suits had been prosecuted to successful issues, and her land had been sold and acquired by said Mudge; that prior to this, however, Price Williams, Sr., through whom the defendants claim, had, with full knowledge of the frauds which had been practiced upon her, by undue means induced her to sell a one-third undivided interest in the land to him, he inducing her to believe that she had no title, except to that extent, and that under the Mudge will, and he also bought the interest of the Mudge children.

There are very many other allegations in the bill, as to irregularites and errors apparent on the records of the two foreclosure suits, &c., but the averments we have stated are sufficient for a determination as to whether "the facts constituting the fraud" are shown to have been discovered within the year of the bill filed. It appears from the foregoing

[Duncan v. Williams.]

outline, that this discovery made by complainant embraced two papers, and nothing more. One of these was the Fash deed. This was wholly unimportant in any aspect, for two reasons: *first*, neither the complainant, nor any other party to the cause, claims through or under Fash; and *second*, he, it is alleged, was a party to the Earle foreclosure suit, made no defense, being without interest, and the decree in that case, whether fraudulent or not, was notice to the complainant that she had no title to the land superior to that of her father, which was thereby subjected to sale and passed into Mudge, and hence the fact shown by this deed was a fact which must, in legal contemplation, have been known to complainant long before. The other paper found was the receipt of Earle as of April, 1840, evidencing the payment at that time of the mortgage, which was afterwards foreclosed. This receipt *is only prima facie* evidence of the payment. The payment itself, if conclusively shown, would be only a fact *tending* to show fraud. The receipt is open to explanation and falsification. But, even if shown to speak the real fact, that fact may be so explained as to deprive it of all probative force in the establishment of the alleged fraud. It is open to proof, notwithstanding the receipt, that the mortgage was not paid, or that the receipt was really intended to evidence the satisfaction of the mortgage by the foreclosure sale of the land, and was incorrectly dated. And, taking the paper as genuine and correct, and conceding the fact to be that the mortgage was then satisfied, it by no means follows that the subsequent foreclosure of the satisfied mortgage by Mudge as attorney for Earle, and Mudge's purchase of the land, was fraudulent. It may well be, that Mudge knew nothing of the alleged satisfaction. Indeed, the presumption of law which obtains under the circumstances shown here is against the imputation of fraudulent knowledge, intent and conduct on his part.—*Prevast v. Gratz*, 6 Wheat. 481. In any view of the paper discovered, therefore, it is merely evidence which *prima facie* is sufficient to establish a fact, which fact, when established, *tends* to show fraud on the part of Mrs. Stringsteel and Mudge in the foreclosure proceeding. To hold that the recent discovery of mere evidence like this, authorizes the destruction of repose and security, with which the statute of limitations envelops long past transactions, would be the opening up of the most solemn and ancient judgments and decrees upon the discovery of any badge of fraud, or suspicious circumstance,

[Duncan v. Williams.]

connected with them; and this, though the very element of suspicion and fraud may be the result of long lapse of time, and derive all its power of impeachment from the death of the parties who knew the facts. We can not accede to such a doctrine.

The bill should have gone further, and alleged with accuracy and precision when and how the complainant came to a knowledge of the various facts averred as constituting the fraud of which she complains. To a recovery it was essential to show, not only that the mortgage had been paid, but that Mudge, knowing this fact, had fraudulently conspired and colluded with Mrs. Sprinsteel to cut off complainant's inheritance. It was also necessary to the relief sought, that knowledge of the fraud, and participation in it on the part of the respondents, should be shown. In one aspect of the case, it was also necessary to aver facts constituting the fraud which is charged against the Hunt decree; and admitting, for the sake of argument, that all these facts are alleged, it is nowhere stated in the bill when or how a knowledge of them came to the complainant; and it does not appear but that all these facts, excepting only the *prima facie* evidence of the payment of Earle's mortgage, were known to the complainant more than one year before bill filed. On this state of averment, the chancellor properly held, that the case presented was without equity as upon a bill praying relief on the ground of fraud, the facts constituting which had been discovered within the period of the exception quoted. *Gordon v. Ross*, 63 Ala. 363; *James v. James*, 55 Ala. 525.

The bill can not be maintained at this late day for the irregularities and errors, however flagrant and fatal if seasonably attacked, apparent on the records of the foreclosure proceedings. In support of the regularity and validity of the decrees, and of the title acquired thereby, almost any fact essential to that end, and certainly any fact necessary to supply the defects pointed out here, whether consistent with or contradictory of the record, will, after the lapse of twenty years, be presumed, to sustain the validity of the proceeding. *Barnett v. Tarrence*, 23 Ala. 463; *Grant v. Phillips, Ib.* 275; *McArthur v. Carrie*, 32 Ala. 75; *Matthews v. McDade*, 72 Ala. 377.

So far as the relief prayed, or any collateral advantage,—as, for instance, the imputation of notice to respondents,—is claimed on the theory that the complainant had adverse possession of the land up to the time of the alleged ouster after

[Dollins & Adams v. Pollock & Co.]

the death of her mother, the position of appellant is untenable. While it is roundly alleged that complainant has been in adverse possession since the death of her father, the facts stated in the bill very clearly negative such possession. It is shown that Mudge entered in 1842, claiming as a purchaser under two foreclosure decrees, one of which, at least, was rendered in a proceeding directly adverse to the complainant; that he remained in possession till his death; that, by his will, a life-estate in the land passed into his widow, who held until her death, when complainant and two others took as tenants in common in remainder, as provided in the will. Under these facts, the occupancy or possession of the complainant with the holder of the legal title could not be adverse and hostile to that title. The possession, on the contrary, is referred to the title, and any right or advantage springing from the possession enured to the benefit of Mudge and those who claim under him.—*Scruggs v. Decatur Land Co.*, 86 Ala. 173.

The bill was without equity in any aspect of its averments, and the decree of the chancellor is affirmed.